**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEFF TUPPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20CV986 JAR |
| | ) | |
| ST. FRANCOIS COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendants' Motion for Summary Judgment [ECF No. 88]. Plaintiff filed his response in opposition to Defendants' Motion. This matter is fully briefed and ready for disposition. For the reasons set forth below, the Court will grant Defendants' Motion for Summary Judgment.

### Background

Plaintiff Jeff Tupper filed this civil rights action against Defendants St. Francois County and several of its employees, alleging one count of deliberate indifference to serious medical needs against all Defendants (Count I) and failure to train against St. Francois County (Count II).

Defendants filed the instant motion, claiming they are entitled to summary judgment on both counts of Plaintiff's Third Amended Complaint. Defendants attached a Statement of Uncontroverted Material Facts to their Motion, which Plaintiff responded to and noted his oppositions. Plaintiff filed his response, opposing Defendants' Motion as to Count I against Defendant Heather Katherine Smith only. Plaintiff did not oppose granting summary judgment for all other jail defendants indicating that "plaintiff cannot establish causation as to these defendants." The parties each attached exhibits, including affidavits and portions of deposition testimony, with their respective memoranda.

**Facts**

The following facts are taken from Defendant's Statement of Uncontroverted Facts [ECF No. 89-1] and are undisputed, unless otherwise noted:

On August 23, 2017, Tabitha Tupper was arrested and booked into the St. Francois County Jail. The medical intake form indicates that Tupper was disoriented or confused and complained of pain "everywhere." Tupper died on October 9, 2017 as a result of a cerebral abscess.

Prior to October 9, 2017, Deputy Ashley Bates, a P.O.S.T. certified deputy of the St. Francois County Sheriff's Department, was alerted on two occasions of concerns by other detainees about Tupper. During mid-to-late September 2017, Defendant Bates was first notified that Tupper did not feel well and could not stand. Bates memorialized this occurrence that it was reported to her that Tupper "was acting like she could not stand on her own...but when [Bates] came back to the Block later she [was] standing by the wall on the phone, perfectly fine not complaining a single bit." Bates Log Entry, ECF No. 89-6 at pg. 1.

On or about September 30, 2017, several detainees housed with Tupper approached Bates about Tupper during the evening lockdown. The detainees reported to Bates that Tupper was making herself throw up and urinating on herself, at which point Bates removed Tupper from the cell. Bates memorialized this interaction in a log entry noting that several detainees advised that Tupper was "purposely making messes;" "mak[ing] herself throw-up and pee on herself so that they [the other inmates] would baby Tabitha;" and "they eventually started acting like they were sleeping and at night she would get up and do everything normally," so that's how "they found out she was faking." *Id.* Bates did not observe anything wrong with Tupper at that time and remembers that Tupper listened to her and followed her instructions. Bates Declaration, ECF No.

89-5 at pg. 2. Bates asked Tupper if she needed any medical help, and she told Bates she was fine. *Id.*

On or about October 1, 2017, Bates spoke to the jail nurse, Defendant Smith, about the reports from the other female detainees that Tupper was making herself vomit and urinating on herself. Bates requested that Defendant Smith check on Tupper, which she indicated to Bates that she would do. Bates provided a copy of her log entry to Defendant Smith that documented her interactions with Tupper in more detail. It was undisputed by Plaintiff that during Tupper's detention in the St. Francois County Jail, Bates did not have any knowledge that the above-described occurrence evidenced or even might have evidenced a serious medical condition.

Defendant Smith is a Licensed Practical Nurse (LPN) and worked as the Jail Nurse for the St. Francois County Sheriff's Department from April 2016 through June 2021. In addition to her full-time hours, she was also on-call for the jail staff twenty-four hours per day, seven days a week. It was not uncommon for her to receive calls or texts about detainees from the jail staff after hours and on weekends.

Defendant Smith attended nursing school at Four Rivers Vocational Technical School, graduating in 1998. Her nursing license with the State of Missouri has been active and in good standing since that time. In addition to her nursing license, she is certified in First Aid, CPR, and Intravenous (I.V.) medication administration. Prior to working for St. Francois County, she worked at various nursing homes and began working in corrections in 2011. She worked at the Eastern Regional Diagnostic and Correctional Center in Bonne Terre, Missouri from 2011 through 2016, and also worked at the Farmington Correctional Center part-time since December 2018. Throughout her employment, Defendant Smith received continuing education relating to the nursing field.

On October 2, 2017, Defendant Smith examined Tupper and documented her findings. Defendant Smith noted that Tupper "stumbled when getting off the bunk" and complained that she was "hurting all over." Defendant Smith assisted Tupper in walking to the examination room. Tupper was able to answer simple questions but unable to recall her medical history. Tupper was noted to be "easily frustrated" and "had difficulty putting thoughts into words." Defendant Smith called and spoke with the Jail's doctor, Charles Pewitt. She advised Dr. Pewitt of Tupper's symptoms that she observed but did not include reports that she had been vomiting and incontinent. Dr. Pewitt prescribed 800mg of ibuprofen and instructed Defendant Smith to monitor Tupper. Dr. Pewitt does not deny that he spoke to Defendant Smith on October 2, 2017 about Tupper, but he does not recall the conversation. He typically would not document such a call.

On that same day, October 2, 2017, Defendant Smith caused Tupper to be seen by Jennifer Beard, a licensed clinical social worker employed by BJC Behavioral Health as a Community Behavioral Health Liaison. Beard's job involves working with law enforcement, jails and the courts relative to individuals they think may have mental health problems or concerns. She has been doing this type of work for the St. Francois County Jail since November 2016.

Beard documented her visit with Tupper, noted Tupper's "most recent behavioral health issue" was on October 2, 2017, and that she had "non-acute mental health needs," meaning that Beard did not see any needs that had to be addressed immediately.  Beard did not refer Tupper to any other services. It was undisputed by Plaintiff that Beard did not observe anything during her meeting with Tupper that led her to believe that Tupper was suffering from a serious medical condition. It was also undisputed by Plaintiff that between October 3 and October 9, Defendant Smith monitored Tupper's condition, noting no issues.

4

On the morning of October 9, 2017, Jason DeJournett, a P.O.S.T. certified deputy of the St. Francois County Sheriff's Department, went to the "G-tank" in response to noise from the detainees. The other detainees told DeJournett to check on Tupper, and he saw her in her cell, laying in vomit. Prior to this, DeJournett did not have any knowledge about Tupper's physical or mental condition during her detention. He contacted his supervisor, Scott Miller, who then came and placed Tupper in a wheelchair and moved her to holding cell "R-3" in the booking area for observation. While she was in the cell, DeJournett saw Tupper vomiting and dry heaving. DeJournett called Defendant Smith and reported that they had an inmate who was vomiting. Miller also telephoned Defendant Smith and advised her that Tupper was nauseated and vomiting, and she recommended keeping Tupper up front for observation. Defendant Smith has no recollection of receiving any phone calls on October 9, 2017 concerning Tupper. DeJournett periodically checked on Tupper while she was housed in the booking area. At one point, DeJournett noticed that Tupper was not vomiting as much, and she told him that she had a headache. When DeJournett checked on Tupper at approximately 11:28 a.m., she was unresponsive. He alerted Miller and Matthew Misuraca, a P.O.S.T. certified deputy of the St. Francois County Sheriff's Department, and then retrieved the automated external defibrillator. 911 was contacted for emergency medical assistance for Tupper and deputies assisted in performing CPR on Tupper until the medics arrived and took over Tupper's care. An autopsy revealed that Tabitha died from complications due to a cerebral abscess. Plaintiff's Response, ECF No. 108-13 at pg. 5.

Plaintiff's case, as set out in his response, is that Dr. Bruce Polsky would testify that "Tabitha would not have died had Nurse Smith or Dr. Pewitt sent her to the emergency room or to a doctor on October 2." Plaintiff does not have any expert medical testimony that if Tupper

had received any medical treatment on the morning of October 9, 2017, prior to her death, she would not have died from the cerebral abscess.

## Legal Standards

<u>Summary Judgment</u>

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine [dispute] of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn*., 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id*. "The basic inquiry is whether it is so one-sided that one party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citation omitted). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citation omitted). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks and citation omitted).

To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). "Simply referencing the complaint, or alleging that a fact is otherwise, is

6

insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines,* 536 F.3d 813, 818 (8th Cir. 2008). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005).

<u>Qualified Immunity</u>

Qualified immunity "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Ivey v. Audrain Cnty.,* 968 F.3d 845, 848 (8th Cir. 2020) (quoting *Thiel v. Korte*, 954 F.3d 1125, 1128 (8th Cir. 2020)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna,* 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

Qualified immunity analysis involves two inquiries: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. See *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**Discussion**

Defendant Smith first argues she is entitled to summary judgment on Count I of Plaintiff's Third Amended Complaint because a plaintiff who wishes to sue a state official in his/her individual capacity must expressly so state in his complaint, and here, he fails to do so.

Defendant Smith further maintains if the Court finds she was sued in her individual capacity, she is entitled to qualified immunity because Plaintiff cannot prove (i) the existence of

an objectively serious medical need diagnosed by a physician or so obvious that even a layperson would easily recognize the need for a doctor's attention; (ii) that she actually knew of and disregarded that need, such that it can be said they intentionally refused to provide essential care; and, (iii) the constitutional right, under the specific circumstances of this case, was not clearly established at the time of the purported misconduct.

Plaintiff does not respond to his failure to identify the capacity in which he is suing Defendant Smith in his Third Amended Complaint. Instead, in his opposition, Plaintiff maintains that there is sufficient evidence for a reasonable jury to find that Defendant Smith acted with deliberate indifference, and is therefore, she is not entitled to qualified immunity,

Plaintiff's Third Amended Complaint replaces prior complaints in their entirety. The Court agrees with Defendant that the silence in Plaintiff's Third Amended Complaint regarding the capacity in which he is suing Defendant shall be interpreted as including only an official capacity claim. *Egerdahl v. Hibbing Cmty. College*, 72 F.3d 615, 619 (8th Cir. 1995) (citing *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989)); *See also, Walker v. Arkansas Dep't of Correction*, 669 Fed.Appx. 335, 336 (8th Cir. 2016) (citing *Baker v. Chisom,* 501 F.3d 920, 923 (8th Cir. 2007)) (if the complaint is silent as to capacity in which plaintiff is suing defendant, the court will interpret complaint as asserting only official-capacity claims). Because Plaintiff does not allege an unconstitutional governmental policy or custom, Count I fails to state a legally cognizable official capacity claim and should be dismissed.  *See Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

Even if the Court were to construe Plaintiff's claim to be suing Defendant in her individual capacity, with an application of "plaintiff-friendly" version of the facts, the individual capacity claim still fails because the evidence does not support a finding that Defendant Smith acted with deliberate indifference. *See Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019)

(explaining that deliberate indifference is more than negligence or gross negligence and requires culpability akin to criminal recklessness).

The Court will first address whether there has been a violation of a constitutional right under the qualified immunity analysis. *See Pearson*, 555 U.S. at 236.

<u>Constitutional Violation</u>

It is well established that the deliberate indifference to the serious medical needs of prisoners[1] violates the right to due process. *Barton v. Taber,* 908 F.3d 1119, 1123 (8th Cir. 2018). "[D]eliberate indifference is a difficult standard to meet." *Spencer v. Knapheide Truck Equip., Co.,* 183 F.3d 902, 906 (8th Cir. 1999). "Deliberate indifference is more than negligence, more even than gross negligence. It may be found where medical care is so inappropriate as to evidence intentional maltreatment." *Johnson*, 929 F.3d at 575 (cleaned up); *See also, Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) ("The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness."). To succeed on a deliberate-indifference claim, Plaintiff must "clear a substantial evidentiary threshold." *Id.* at 576 (quoting *Nelson v. Shuffman*, 603 F.3d 439, 448–49 (8th Cir. 2010)). To establish deliberate indifference, Plaintiff must show (1) that she suffered from an objectively serious medical need, and (2) that the jail officials knew of, but deliberately disregarded that need. *Hancock v. Arnott,* 39 F.4th 482, 486 (8th Cir. 2022) (citing *Barton*, 908 F.3d at 1124). "Whether an inmate's condition is a serious medical need and whether an official was

---

[1] Tupper was initially a pre-trial detainee, but at the time of her death in October 2017, her probation had been revoked and she was awaiting transfer to the Department of Corrections. While she was pretrial detainee, and not a prisoner, Tupper was "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); *See also, Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (applying the Eighth Amendment deliberate-indifference standard for inmates' claims to pretrial detainee's claim under the Fourteenth Amendment).

deliberately indifferent to the inmate's serious medical need are questions of fact." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).

*Serious Medical Need*

A serious medical need is "'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Davis v. Buchanan, Cnty.,* 11 F.4th 604, 623–24 (8th Cir. 2021) (quoting *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir. 1995)). It is undisputed by the parties that a physician had not diagnosed Tupper's cerebral abscess until after she died, so the issue here is the latter. The Eight Circuit has discussed serious medical needs that are obvious to a layperson. *See, e.g., Pool v. Sebastian County, Ark.,* 418 F.3d 934, 945 (8th Cir. 2005) (inmate was pregnant, bleeding, and passing blood clots); *Hartsfield*, 371 F.3d at 457 (inmate had swollen and bleeding gums and complained of extreme tooth pain); *Roberson v. Bradshaw,* 198 F.3d 645, 647–48 (8th Cir.1999) (inmate experienced excessive urination, diarrhea, sweating, weight loss, and dehydration related to known diabetes); and *Coleman v. Rahija,* 114 F.3d 778, 785 (8th Cir. 1997) (her medical records clearly documented a history of rapid labor and delivery and inmate exhibited signs of early labor).

The Eight Circuit has explained, "[t[he determination whether a medical need is sufficiently obvious cannot be analyzed in a vacuum. The prison officials' background knowledge is part of the analysis." *Jones v. Minn. Dep't of Corr.,* 512 F.3d 478, 482 (8th Cir. 2008). In *Jones*, the inmate "was unable to stand or walk under her own power, was 'google-eyed' and unresponsive, was rolling on the ground while grunting and groaning, [had dried blood and cuts on her lips], smelled as if she had urinated on herself, and was breathing at a very rapid rate." *Id.* at 482 (footnote omitted). During her intake, the nurse took Jones's vital signs and did not confer with a doctor about the symptoms being exhibited. *Id.* Later, she was found

10

unresponsive in her cell, having died of a pulmonary edema. *Id.* at 481. Her underlying condition, however, only became evident after her autopsy. *Id.* The Court found no reasonable jury could find that Jones suffered from an objectively serious medical need. *Id*. at 482.

Like the issue in *Jones,* Tupper's condition must have been so obvious that a layperson would easily recognize the need for treatment. On October 2, 2017, when Defendant Smith examined Tupper, she documented her findings. Tupper "stumbled when getting off the bunk" and complained that she was "hurting all over." Defendant Smith assisted Tupper in walking to the examination room. Tupper was able to answer simple questions but unable to recall her medical history. Tupper was noted to be "easily frustrated" and "had difficulty putting thoughts into words." Defendant Smith also noted recent vomiting, which was not based on her personal observation, but Bates documentation in her log entry as "self-induced."

Unlike the nurse in *Jones*, Defendant Smith then called and advised the Jail's doctor, Dr. Pewitt, of Tupper's symptoms that she witnessed. Dr. Pewitt prescribed 800mg of ibuprofen and instructed Defendant Smith to monitor Tupper. As an LPN, Defendant Smith does not hold a medical degree as Dr. Pewitt does, and he did not recognize a serious medical need. If a medical doctor failed to grasp the seriousness of her condition, an LPN like Defendant Smith, cannot be expected to do so. It is well-established that '[i]f trained health care officials could not find a serious medical need in these circumstances, then we decline to hold a reasonable layperson should have done so." *Roberts v. Kopel,* 917 F.3d 1039, 1043 (8th Cir. 2019) (quoting *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995)).

Because Defendant Smith's background knowledge is also part of this analysis, it is worth noting that Deputy Bates memorialized her interaction with Tupper on September 30, 2017 after several detainees reported she was "purposely making messes;" "mak[ing] herself throw-up and pee on herself so that they [the other inmates] would baby Tabitha;" and "they

11

eventually started acting like they were sleeping and at night she would get up and do everything normally," so that's how "they found out she was faking." Bates Log Entry, ECF No. 89-6 at pg. 1. Defendant Smith received this information in Bates log entry on October 1, 2017 when Bates asked her to check on Tupper.

Further, on October 2, 2017 after Defendant Smith saw Tupper, she had Tupper meet with Jennifer Beard, a licensed clinical social worker, who noted she had "non-acute mental health needs." Beard did not see any medical needs that had to be addressed immediately nor did she refer Tupper to any other services.

It is undisputed based on these facts that Defendant Smith and Beard, who both saw Tupper in person on October 2, 2017, did not identify a condition so obvious that Tupper needed medical treatment and certainly did not have the ability to diagnose increased intracranial pressure (ICP). Defendant Smith even went a step further to make sure her conclusion that Tupper's symptoms were not those of a serious medical need and contacted the jail doctor, who also failed to recognize such a condition. Defendant Smith, in her position as an LPN, properly followed instructions from a medical doctor and no facts presented here convince this Court that she should not have relied on Dr. Pewitt's directive.

Plaintiff argues that the opinion of his expert, Dr. Bruce Polsky, supports his claim that Defendant Smith was deliberately indifferent to Tupper's serious medical needs. Defendant Smith has filed a Motion to Exclude and Disqualify Testimony of Expert Dr. Polsky, which remains pending [ECF No. 92]. For purposes of this Order only, the Court will consider Dr. Polsky's opinions.

Dr. Polsky, who is an infectious disease specialist, opined "[a]ssuming that LPN Smith reported Tabitha's symptoms to Dr. Pewitt as she testified, Dr. Pewitt should easily and quickly have recognized that Tabitha was suffering from ICP and needed immediate medical attention."

12

Polsky Opinion Report, ECF No. 89-21 at pg. 3. Dr. Polsky indicated in his deposition that he isn't qualified to testify about what a nurse's standard of care is, but suggests anyone would have known that Tupper had a serious medical condition and Defendant Smith should have sent her to the hospital. However, he did agree that nobody actually knew she had ICP.

> He further opined:
>
> Tabitha Tupper would not have died had LPN Smith or Dr. Pewitt transferred her to the hospital emergency department (ED) on October 2, 2017. An evaluation at the ED would have included a computed tomography (CT) scan of Tabitha's brain that would have revealed the cerebral abscess. As noted in the report of plaintiff's neuropathology expert, Dr. Peter Pytel, the abscess was likely present for at least 10 days, or even longer. Once diagnosed, Tabitha would have been admitted to the hospital, closely monitored, received consultations with specialists from neurology and infectious diseases. She would have been administered antibiotics, corticosteroids and other interventions to reduce the pressure in her brain, leading to a full recovery.

*Id.* at 4.

Dr. Polsky's basis for this opinion is unclear to the Court. He provides no evidence or basis to support how his expertise as infectious disease specialist leads to the conclusory opinion that had Tupper been taken to the hospital, those specific tests would have been performed, which would have led to her ICP diagnosis, and she would have made a full recovery. Even with consideration of Dr. Polsky's opinion, Plaintiff still does not prove Defendant Smith was deliberately indifferent to Tupper's serious medical needs.

Plaintiff also argues that Tupper's cerebral abscess is an undisputed serious medical need because it is "always fatal if left untreated." The Eight Circuit rejected a similar argument in *Jones* that a pulmonary edema was per se a serious medical condition and did not satisfy the first prong of the analysis. *Jones*, 52 F.3d at 483. In declining to hold that prison officials violated her constitutional rights, the Eight Circuit reasoned that "[t]he question here ... is not, in hindsight, whether Jones had a serious medical condition, but rather, whether the condition was so obvious that a layperson would have easily recognized the need for medical

13

treatment." *Id.* at 483. "While some medical conditions that result in death are obvious to a layperson, not all are." *Id.,* citing *Grayson v. Ross,* 454 F.3d 802, 809-10 (8th Cir. 2006) (no objectively serious medical need because it would not have been obvious to a layperson that an inmate required immediate medical attention even though intoxication resulted in death).

Tupper's exhibited symptoms, such as being incontinent, inability to stand or walk, grunting and groaning, are similar, but not as severe as those experienced by the inmate in *Jones*. Unlike passing blood clots while pregnant; bleeding gums with complaints of extreme tooth pain; excessive urination, dehydration, sweating, and weight loss; and signs of early labor— which all obviously indicate a medical issue—Tupper's symptoms, although significant, did not give rise to a clearly identifiable serious medical condition.

*Deliberate Indifference*

"Under the subjective prong, to show deliberate indifference, the official must know of and disregard the inmate's serious medical need." *Davis*, 11 F.4th at 624 (cleaned up). "[T]he evidence must show that [Defendant] recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015), quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (emphasis in original). "The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious." *Rahija,* 114 F.3d at 786. "Generally, the actor manifests deliberate indifference by intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." *Davis,* 11 F.4th at 624.

Plaintiff claims that Defendant Smith had actual knowledge of a serious medical need, but on this record no reasonable jury could find that she did. Since Tupper's medical issues were not obvious, actual knowledge *cannot be inferred* from the facts as present on October 2.

Further, none of the circumstantial evidence supports the inference that Defendant Smith believed Tupper had a serious medical issue as explained in detail above. *See Rusness v. Becker Cnty.,* 31 F.4th 606, 617 (8th Cir. 2022) (citing *Jones*, 52 F.3d at 482-84 (detainee did not manifest signs of serious medical need that would be sufficiently obvious to a layperson, and thus personnel did not violate any Eighth or Fourteenth Amendment right of detainee through deliberate indifference)).

"[A]n official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 838 (1994). At most, the Defendant Smith was negligent in not recognizing a medical need, which does not rise to the level of deliberate indifference. *See James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006) ("A review of appellees' conduct in this case, however arguably negligent it may now appear in the clear light of hindsight, does not reveal the existence of deliberate indifference."). Plaintiff has not "clear[ed] the substantial evidentiary threshold" to succeed on a deliberate-indifference claim. *Johnson*, 929 F.3d at 576; *See also, Holden,* 663 F.3d at 343 ("The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness."). Therefore, Defendant Smith is entitled to qualified immunity. *See Grayson,* 454 F.3d at 808 ("If the answer [to whether a constitutional right was violated] is no, we grant qualified immunity.").

**Conclusion**

The death of Tabitha Tupper was certainly tragic, but it was not caused by any alleged deliberate indifference of Defendant Smith. For the reasons set forth above, Defendant Smith is entitled to summary judgment on Count I of Plaintiff's Third Amended Complaint. Defendant St. Francois County is entitled to summary judgment on Count II and the remaining Defendants

15

named in Count I are entitled to summary judgment, based on Plaintiff's agreement that there is no evidence of causation.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [ECF No. 88] on Count I as to Defendant Heather Katherine Smith is **GRANTED**.

**IT IS FURTHER ORDERED** that, in light of Plaintiff's lack of opposition, Defendant's Motion for Summary Judgment [ECF No. 88] on Count II against St. Francois County is **GRANTED.**

**IT IS FURTHER ORDERED** that, in light of Plaintiff's lack of opposition, Defendant's Motion for Summary Judgment [ECF No. 88] on Count I as to the remaining Defendants, Sheriff Dan Bullock, Dennis W. Smith, Ashley Bates, Matthew Misuraca, Jason DeJournett, Phillip Cook, Scott Miller and Hardy White, is **GRANTED**.

**IT IS FURTHER ORDERED** that any remaining pending motions in this case are **DENIED AT MOOT.**

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 19th day of July, 2023.

_John A. Ross_____

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**